IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
BIG STONE GAP DIVISION

| | |
|---|---|
| **SONYA K. OLSON,** ) | |
| ) | |
| Plaintiff, ) | Case No. 2:11CV00007 |
| ) | |
| v. ) | **OPINION** |
| ) | |
| **MICHAEL J. ASTRUE,** ) | By:  James P. Jones |
| **COMMISSIONER OF** ) | United States District Judge |
| **SOCIAL SECURITY,** ) | |
| ) | |
| Defendant. ) | |

*Pamela A. Counts, Lee & Phipps, PC, Wise, Virginia for Plaintiff; Eric P. Kressman, Regional Chief Counsel, Region III, Lori Karimoto, Assistant Regional Counsel, Office of the General Counsel, Social Security Administration, Rafael Melendez, Special Assistant United States Attorney, Philadelphia, Pennsylvania, for Defendant.*

In this social security case, I affirm the final decision of the Commissioner.

I

Plaintiff Sonya K. Olson filed this claim challenging the final decision of the Commissioner of Social Security (the "Commissioner") denying her claim for disability insurance benefits ("DIB") pursuant to Title II of the Social Security Act (the "Act"). 42 U.S.C.A. §§ 401-433 (West 2011). Jurisdiction of this court exists pursuant to 42 U.S.C.A. § 405(g) (West 2011).

Olson filed an application for benefits on July 25, 2007. The claim was denied initially on October 16, 2007, and upon reconsideration on February 19, 2008. A hearing was held before an administrative law judge ("ALJ") on August 20, 2009. At the hearing Olson, represented by counsel, and an independent vocational expert testified. The ALJ denied her claim and that decision became final when the Social Security Appeals Council denied her request for review. Olson then filed her Complaint in this court, objecting to the Commissioner's final decision.

The parties have filed cross motions for summary judgment, which have been briefed. The case is ripe for decision.

II

Olson was born on June 3, 1978, making her a younger individual under the regulations. 20 C.F.R. § 404.1563(c) (2011). She completed two semesters of college. She is married and lives with her husband and two young children. Her past relevant work was in retail where she worked as a department head associate, a retail sales person, a manager of retail and a mystery shopper. She last performed substantial gainful activity in November 2003. She last met the insured

status requirements on December 31, 2008.  She claims she is disabled because of a pituitary gland tumor, migraine headaches, leg pain, and depression.

Olson's problems first began after the birth of her oldest child.  After she stopped breastfeeding her son in August 2003, she began gaining weight and continued to lactate, a symptom called galactorrhea.  Tests showed that her prolactin level was increased.  In November 2004, Olson underwent a CT scan of her head, which showed that she had a pituitary gland adenoma (a tumor on her left pituitary gland).  She was given an MRI in December 2004 which showed a five to six millimeter adenoma.  Her treating physician, Neil Barry, M.D., referred her to Lewis Blevins Jr., M.D., with Vanderbilt University for endocrinology treatment.  She was first seen by Dr. Blevins on December 29, 2004.  He reviewed her MRI and confirmed the existence of the pituitary microadenoma.  He assessed it as nonfunctioning at that time.

At her appointment in March 2006, Dr. Blevins noted that Olson had no symptoms of cellular mass effect or of anterior pituitary hormone excess or deficiency.  At her October 2006 appointment, she underwent another MRI and Dr. Blevins reviewed it and concluded that the tumor had not increased in size.  He noted that her pituitary functions were normal, although she was experiencing fatigue, night sweats, hot flashes, irregular menses and continued lactation eight months after giving birth to her second child.  At her February 2007 appointment,

Dr. Blevins described Olson's adenoma as a "Microprolactinoma" and noted that she was taking Dostinex.  (R. at 381.)  He also noted that her insomnia had improved and felt that her prolactinoma was well controlled.  Olson was referred for an echocardiogram because cardiac valvular disease is a possible side effect of the medication she was taking for her hyperporlactinemia.  The results were normal.

In November 2006, Dr. Barry noted that Olson had "some depression" at her check up appointment.  (R. at 369.)

In March 2007, Olson presented to Pennington Family Health Center to establish treatment with a primary care physician, Jill Couch, M.D.  She complained of increasing headaches.  Dr. Couch thought that the headaches were possibly migraine related and referred Olson for another MRI. The results showed "[n]o acute or any significant abnormalities are identified in the MRI of the brain and pituitary gland.  Previously noted suggestion of microadenoma or prolactinoma on the left side of the pituitary gland is less prominent at this time." (R. at 396.)  At her September 2007 appointment, Olson's physical exam was unremarkable. Dr. Couch decided to put her on Topamax as well as Imitrex for the headaches.  She also encouraged Olson to exercise and noted that she felt Olson might be "slightly depressed."  (R. at 388.)

In October 2007, Olson had another appointment with Dr. Couch. While she reported that the headaches had improved a lot with the medication, she complained of fatigue and weight gain. She had not started an exercise program. She told Dr. Couch that she wanted to see another endocrinologist because Dr. Blevins thought her weight gain was due to inactivity, not the adenoma. Her exam was unremarkable and Dr. Couch again thought she was slightly depressed and encouraged her to exercise.

In December 2007, Lisa S. Howard, O.D., provided updated opthamology information on Olson and noted that the most recent visit was November 2007. Olson's best corrected visual acuity was 20/25 in each eye and she had some loss relating to the lower lateral left quadrant of her visual field. His clinical findings were indicative of optic nerve edema (i.e. a swollen optic nerve). Dr. Howard referred Olson to William Curtis, M.D., who ordered an MRI of her brain and orbit to rule out an enlarging pituitary, a pseudotumor, optic neuritis, or another possible reason for the edema. The MRI showed that the pituitary adenoma was less prominent and Olson was sent to Patrick Lavin, M.D., for a neuro-opthamology evaluation. Dr. Lavin determined that the swelling of Olson's left optic nerve was most likely related to resolving pseudotumor cerebri. He did not believe that a spinal tap was necessary. Dr. Lavin's progress notes indicated continued improvement in the swelling of Olson's optic nerve.

In December 2008, Olson presented to Cherokee Health Systems, stating that her attorney recommended that she receive an evaluation because she had applied for disability. As reported by the behavioral health intake evaluation, Olson's appearance was normal, her attitude was cooperative, and her motor activity was calm. Her speech was excessive and her affect was labile but her mood was not depressed, anxious, hypomanic, or manic. Her thought content was normal and thought process was circumstantial. She was diagnosed with an unspecified bipolar disorder and her global assessment of functioning was rated at 55 and she was recommended for individual therapy and psychiatric services.

Olson had her initial psychiatric evaluation in February 2009 and complained of anxiety and depression. She denied ever needing psychiatric hospitalization. Her appearance was normal and she was cooperative. Her motor activity was calm, her speech was normal, and her thought processes and thought content were normal. Her affect was restricted. She was diagnosed with a bipolar disorder not otherwise specified, rule out an organic affective disorder, and hypochondriasis by history. Her GAF was rated at 60. She was prescribed Topamax. Though she was scheduled for therapy and medication follow-ups at four week intervals, Olson submitted no records relating to this treatment.

In March 2009, Olson underwent a stress test. It showed no EKG evidence of coronary insufficiency but she had a moderate impairment of her functional aerobic capacity.

In April 2009, Olson presented to Thomas Robbins, M.D. She had no complaints other than her concerns related to some recent visual disturbance. Her physical exam was unremarkable and her bipolar disorder was stable. Dr. Robbins continued Olson's medication regimen and sent her to an opthamologist. The opthamology evaluation revealed her visual fields were in "good shape." (R. at 538.)

In October 2007, Olson's filed was reviewed by Robert McGuffin, M.D., a physician consultant with the state agency. McGuffin concluded that Olson's adenoma, migraines, and probable RLS did not prevent her from performing light type work. He concluded that Olson's statements regarding her symptoms and their effects on her functioning were only partially credible. During the same month, E. Hugh Tenison, Ph.D., a psychological consultant who worked with the state agency, also reviewed Olson's file. Dr. Tenison determined Olson had an affective disorder that was not a severe impairment because it had caused no restriction in her ADL, social functioning, concentration, persistence or pace. Also, Olson's condition had not caused an episode of decompensation.

In February 2008, Donald Williams, M.D., a physician consultant who worked with the state agency, reviewed Olson's file. Dr. Williams determined that Olson's adenoma, migraines, probably RLS, and optic nerve edema did not preclude her from performing light work. That same month, Howard S. Leizer, Ph.D., a psychological consultant who worked with the state agency, also reviewed Olson's file. Dr. Leizer agreed with Dr. Tenison's opinion.

Olson completed a Function Report – Adult questionnaire in August 2007. She reported that she lived with her husband and two children and was the primary caregiver for the children. Olson said she spent her day reading, preparing meals, cleaning, doing laundry, grocery shopping, and surfing and shopping on the internet. She paid bills, handled a savings account, and used a checkbook/money. Her condition had not affected her ability to get along with others, complete tasks, understand, and follow instruction.

A hearing on Olson's application for benefits was held on August 20, 2009, before Administrative Law Judge Richard L. Schwartz. Olson testified that she disliked leaving the house and socializing, she still drove, and she usually did the grocery shopping with her husband, and occasionally needed help caring for her young children. The vocational expert testified that an individual with Olson's limitations who was able to perform light work would be able to perform her past relevant work except for the mystery shopper. The ALJ issued a decision on

October 5, 2009, and concluded that Olson had the severe impairments of a pituitary gland tumor, migraine headaches, and optic nerve edema on the left eye. He determined that none of these impairments met or equaled listing requirements and that Olson had the residual functional capacity to perform light work.

Gross argues that the ALJ's decision is not supported by substantial evidence. For the reasons below, I disagree.

### III

The plaintiff bears the burden of proving that she is under a disability. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). The standard for disability is strict. The plaintiff must show that her "physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C.A. § 423(d)(2)(A).

In assessing DIB claims, the Commissioner applies a five-step sequential evaluation process. The Commissioner considers whether the claimant: (1) has worked during the alleged period of disability; (2) has a severe impairment; (3) has a condition that meets or equals the severity of a listed impairment; (4) could return to her past relevant work; and (5) if not, whether she could perform other

work present in the national economy.  *See* 20 C.F.R. § 404.1520(a)(4) (2011).  If it is determined at any point in the five-step analysis that the claimant is not disabled, the inquiry immediately ceases.  *Id*.  The fourth and fifth steps of the inquiry require an assessment of the claimant's residual functional capacity, which is then compared with the physical and mental demands of the claimant's past relevant work and of other work present in the national economy.  *Id.*; *Johnson v. Barnhart*, 434 F.3d 650, 653-54 (4th Cir. 2005).

In accordance with the Act, I must uphold the Commissioner's findings if substantial evidence supports them and the findings were reached through application of the correct legal standard.  *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996).  Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quotation marks and citation omitted).  Substantial evidence is "more than a mere scintilla of evidence but may be somewhat less than a preponderance."  *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).  It is the role of the ALJ to resolve evidentiary conflicts, including inconsistencies in the evidence.  *Seacrist v. Weinberger*, 538 F.2d 1054, 1056-57 (4th Cir. 1976).  It is not the role of this court to substitute its judgment for that of the Commissioner.  *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).

Olson first argues that the ALJ erred in failing to address all of the evidence in the record. Specifically, Olson argues that the ALJ did not consider the evidence of Dr. Barry's treatment of her as reported in Exhibit 5F. An ALJ must consider all the evidence and explain on the record the reasons for his findings, including the reasons for rejecting relevant evidence in support of the claim. *See Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979). However, the ALJ is not required to discuss or refer to every piece of evidence in the record so long as the court can discern the basis of his decision. *See Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d Cir. 2001). As the defendant notes, although the ALJ did not specifically mention Exhibit 5F in his decision, Dr. Barry's records contained in Exhibit 5F were duplicates of those contained in Exhibit 4F. There were only two additional treatment notes in Exhibit 5F from December 2006 and January 2007 and those records addressed Olson's treatment for cholelithiasis and pharyngitis. Neither of these notes contained relevant probative evidence because these conditions were not adversely impacting her ability to function. *See Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984); *see also Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 204 (3d Cir. 2008).

Olson argues that the ALJ did not consider Dr. Barry's diagnoses of pituitary adenoma, weight gain, fatigue and depression. Dr. Barry was Olson's primary care physician from 2004 to the beginning of 2007. The diagnoses in his notes are

repeated throughout the medical records and do not add anything significant to the other medical records. For example, Dr. Barry's references to Olson's pituitary adenoma primarily track her treatment by Dr. Blevins, the doctor to whom Dr. Barry referred her. As for his diagnoses of depression, Dr. Barry's notes only state "depression" and note that Olson "feels like she doesn't want to get out." (R. at 283.)

While it is true that the ALJ's opinion does not mention Dr. Barry specifically or explicitly review his notes, it is clear that the ALJ gave extensive consideration to the effect of the pituitary adenoma, weight gain, fatigue and depression on Olson and in doing so, considered the medical records from Dr. Barry. (R. at 18.) The ALJ satisfactorily explained the basis of his decision and his "duty of explanation is not intended to be a mandate for administrative verbosity or pedantry. If a reviewing court can discern 'what the ALJ did and why he did it,' the duty of explanation is satisfied." *Piney Mountain Coal Co. v. Mays*, 176 F.3d 753, 762 n.10 (4th Cir. 1999) (citation omitted).

Olson's second argument is that the ALJ's conclusion that she did not suffer from a severe mental impairment is contrary to substantial evidence in the record. Specifically, Olson points to the diagnoses of depression by Drs. Barry and Couch and her diagnosis and treatment for unspecified bipolar disorder at Cherokee Health Systems. At step two of the five step process, the ALJ must determine

whether a claimant has a medically determinable impairment that is severe. 20 C.F.R. § 404.1520(c) (2011). An impairment or combination of impairments is severe under the regulations only if it significantly limits an individual's ability to perform basic work activities. If the evidence establishes only a slight abnormality that would have no more than a minimal effect on the individual's ability to work, then it is not severe. 20 C.F.R. § 404.1521 (2011).

Drs. Barry and Couch's diagnoses of depression and the diagnosis of unspecified bipolar disorder at Cherokee Health Systems do not require a finding of disability. *See Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986). Olson's own testimony showed that she functioned in managing her family obligations, including caring for her young children and she had not sought any treatment by mental health professionals until the end of 2008. At her hearing, she testified that she was not receiving any current treatment for her mental problems. Further, the state agency psychologists agreed that Olson's mental disorder was not a severe impairment. The ALJ was required to consider the option of these "highly qualified" psychologists who are "experts" in the field of Social Security disability evaluation. 20 C.F.R. § 404.1527(f)(2)(i) (2011). These opinions are consistent with the record as a whole and particularly with the evidence of Olson's treating physicians, Drs. Barry and Couch. Substantial evidence supported the ALJ's conclusion that Olson's mental condition was not severe.

IV

For the foregoing reasons, the plaintiff's Motion for Summary Judgment will be denied, and the defendant's Motion for Summary Judgment will be granted. A final judgment will be entered affirming the Commissioner's final decision denying benefits.

DATED: January 20, 2012

/s/  James P. Jones
United States District Judge